1  MICHELLE R. GHIDOTTI (27180)
   THE LAW OFFICES OF MICHELLE GHIDOTTI
2  1920 Old Tustin Ave.
   Santa Ana, CA 92705
3  Tel: (949) 427-2010
   Fax: (949) 427-2732
4  mghidotti@ghidottilaw.com
5
   Attorney for Creditor
6  US Bank Trust N.A. as Trustee of the SCIG Series III Trust
7
8                    IN THE UNITED STATES BANKRUPTCY COURT
9
                     DISTRICT OF ARIZONA – TUCSON DIVISION
10
11
   In re:                                )   CASE NO.: **4:14-bk-00414-BMW**
12                                        )
   Douglas Allan Carroll                  )   **Chapter 11**
13                                        )
                     Debtors.             )
14  _____  )
                                          )   **MOTION TO REOPEN CASE**
15  US Bank Trust N.A. as Trustee of the SCIG )
   Series III Trust                        )   Re: Real property located at
16                                        )   17055 16th Ave Southwest, Normandy Park,
                     Movant,              )   WA
17                                        )
18                                        )
                                          )
19                                        )
                                          )
20                                        )
                                          )
21                                        )
22        US Bank Trust N.A. as Trustee of the SCIG Series III Trust its successors and/or assignees,

23  by and through its undersigned attorney, moves this Court to reopen this Case.

24  ////

25  ////

26  ////

27        The relief requested in this Motion is proper for all of the reasons set forth in the

28  Memorandum of Points and Authorities attached hereto and incorporated herein by this reference.

                                          1                    4:14-bk-00414-BMW
                                                               Motion to Reopen Case

1

2

3                                          THE LAW OFFICE OF MICHELLE GHIDOTTI

4    Dated:  December 17th, 2018            By:/s/ Michelle R. Ghidotti, Esq.
                                            MICHELLE R. GHIDOTTI
5                                           1920 Old Tustin Ave.
                                            Santa Ana, CA 92705
6                                           Attorneys for Movant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

1. On or about January 13, 2014, Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code. Pursuant to 11 U.S.C. §362, the Petition stays the commencement or continuation of any proceedings against the Debtor or any act to obtain possession of any property of the Debtor or to enforce any lien against any property of the Debtor.

2. This Court has jurisdiction pursuant to 28 U.S.C. §1334. The filing of this Motion commences a contested matter within the meaning of Bankruptcy Rule 9014.

3. Pursuant to Local Bankruptcy Code 4001(b), Movant sent notice to the Debtor's counsel.

4. On or about June 2, 2008, Primary Residential Mortgage Inc. entered into a contract with Douglas Carroll ("Borrower") wherein Borrower agreed to pay the amount of $2,918.44, or more, on or before the first day of every month, beginning on or about July 1, 2008. The obligation is evidenced by a Note and secured by a Deed of Trust. **See Exhibit "B" and Exhibit "A"** respectively. The note is a copy of the promissory note.

5. The Deed of Trust was timely and duly recorded and perfected in accordance with Washington law as Instrument No. 20061004000368 in the office of the King County Recorder.

6. US Bank Trust N.A. as Trustee of the SCIG Series III Trust is now the holder of the Note that is secured by the Deed of Trust and is the real party in interest. **See Exhibit "C"**.

7. The entity has the right to foreclose in the name of US Bank Trust N.A. as Trustee of the SCIG Series III Trust

8. The original principal amount of the Note was $608,000, plus interest, costs and attorneys' fees for collection. Currently, debtors monthly payments are $2,719.71.

9. A plan was confirmed 11/06/2015.

10. The case was closed prior to discharge on 1/22/2016.

11.     The Debtor has failed to make monthly payments, beginning with the month of 10/1/2017, and all subsequent payments, costs, and interest.  Debtor has been in default for 13 months.

12.     As of November 30, 2018, the amount required to fully reinstate the Debtor's loan post-petition is approximately $39,231.57, itemized as follows:

POST-PETITION DELINQUENCIES:

| | | | |
|---|---|---|---|
| Monthly Payments: | 13 | at | $2,719.71 | $35,356.23 |
| Escrow Advances: | 9 | at | $172.53 | $1,552.77 |
| Unsecured Payments | 3 | at | 148.03 | $740.15 |
| Attorney Fees | | | | 494.50 |
| Late Charges | | | | $1087.92 |

Total Post-petition Delinquencies:          $ 39,231.57

13.     The next scheduled payment of $2,719.71  is due 12/1/2018, and continuing each month thereafter.  However, this amount may be subject to change pursuant to the terms of the applicable loan documents.

14.     As of November 30, 2018, the approximate total amount owing on the Note secured by the Deed of Trust is $502,019.73.

15.     Movant has performed all of its obligations required under the Note and Deed of Trust, and all conditions precedent to the Debtor's performance there under have occurred.

## POINTS AND AUTHORITIES

16.     Pursuant to §350(b) of the Bankruptcy Code, a bankruptcy can be reopened for cause. As this is discretionary, the decision should be based on the particular facts of the case and the equities of the case.  *In re Apez Oil Co., Inc.,* 406 F3d 538,542 (8th Cir. 2005).

17.     Bankruptcy courts have considerable leeway in "crafting relief from the automatic stay, including the power to grant retroactive relief from the stay."  *In re Aheong,* 276 B.R. 233, 250 (9th Cr. BAP 2002) (quoting *In re Schwartz,* 954 F.2d 569, 572 (9th Cir. 1992)).  Furthermore, in

determining whether cause exists for annulling the automatic stay, the bankruptcy court may look at balancing whether "the stay harms the creditor and lifting the stay will not unjustly harm the debtor or other creditors." *Id. (*quoting *In re John D. Murray and Bessie J. Murray,* 193 B.R. 20, 22 (1996 Bankr. Lexis 233)). The bankruptcy courts have the discretion to make this determination. *Id.*; see also *In re Kissinger,* 72 F.3d 107, 109 (9th Cir. 1995).

18.    In this case, Debtor filed a petition under Chapter 11 in the District of Arizona on January 13 2014. When the case was closed, almost two years ago, a plan had been confirmed and debtor was current on their post-petition obligation to creditor. Creditor had no reason to object to the closing of the case.

////

////

////

////

////

////

////

////

////

19.    As the matter currently stands, cause exists to re-open the case because debtor has not made post-petition payments in over one year. Additionally it is equitable to reopen the case to allow Movant to file a Motion for Relief from the Automatic Stay.  Movant cannot seek relief in another forum while the bankruptcy stay is in place. At the same time it cannot seek relief in the bankruptcy court while the case remains closed. Unless the case is reopened movant will be completely unable to enforce its security interest in the property. Movant should not be irreparably injured because of a

normal part of a Ch 11 case (closing the case until plan completion) which was ordered years ago under materially different circumstances. Therefore, the case should be reopened to allow Movant to pursue the proper remedies.

THE LAW OFFICE OF MICHELLE GHIDOTTI

Dated: December 18, 2018            By:/s/ Michelle R. Ghidotti, Esq.
                                       MICHELLE R. GHIDOTTI
                                       1920 Old Tustin Ave.
                                       Santa Ana, CA 92705
                                       Attorneys for Movant

4:14-bk-00414-BMW
Motion to Reopen Case

# EXHIBIT "A"

THIS IS CERTIFIED TO BE A
TRUE COPY.

Certified to be a true and correct copy
Transnation Title Insurance Company
By:

After Recording Return To:

PRIMARY RESIDENTIAL
MORTGAGE INC.
4750 W. WILEY POST WAY

SALT LAKE CITY, UTAH 84116

---

[Space Above This Line For Recording Data]

---

LOAN NO. REDACTED     **DEED OF TRUST**
MIN: REDACTED
**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated  SEPTEMBER 26, 2006 ,
together with all Riders to this document.
(B)  "Borrower" is  DOUGLAS CARROLL, AS HIS SEPARATE ESTATE

Borrower is the trustor under this Security Instrument.
(C)  "Lender" is  PRIMARY RESIDENTIAL MORTGAGE INC.

Lender is  A NEVADA CORPORATION  organized and existing under the laws of
NEVADA  .  Lender's address is 4750 W. WILEY POST
WAY, SALT LAKE CITY, UTAH 84116
(D)  "Trustee" is  TRANSNATION TITLE INSURANCE COMPANY,
(E)  "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary
under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has
an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888)679-MERS.
(F)  "Note" means the promissory note signed by Borrower and dated  SEPTEMBER 26, 2006
The Note states that Borrower owes Lender  SIX HUNDRED EIGHT THOUSAND AND NO/100

Dollars (U.S. $ 608,000.00    ) plus interest.  Borrower has promised to pay this debt in
regular Periodic Payments and to pay the debt in full not later than  NOVEMBER 1, 2036  .
(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following
Riders are to be executed by Borrower [check box as applicable]:

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3048  1/01
UIWAMERS.01-11/00 36187.14149    Page 1 of 14

X PREPAYMENT RIDER

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the        COUNTY        of
                                                              [Type of Recording Jurisdiction]
KING                          :
     [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.


APN #: 6116500170
which currently has the address of  17055  16TH AVENUE SW
                                             [Street]
NORMANDY PARK   , Washington      98166       ("Property Address"):
        [City]                  [Zip Code]

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
UIWAMERS.02-11/00 36187.14149                    Page 2 of 14                          Form 3048   1/01

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3048    1/01
UIWAMERS.03-11/00 36187.14149                                      Page 3 of 14

# EXHIBIT "A"

UNIT 22B, OF NEW GLEN ACRES DIV NO. 01, A CONDOMINIUM RECORDED IN VOLUME 1 OF CONDOMINIUMS, PAGES 65 THROUGH 71, INCLUSIVE, ACCORDING TO THE DECLARATION THEREOF, RECORDED UNDER KING COUNTY RECORDING NO. 6298732, AND ANY AMENDMENTS THERETO;

SITUATE IN THE CITY OF SEATTLE, COUNTY OF KING, STATE OF WASHINGTON.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
UIWAMERS.04-11/00 36187.14149                Page 4 of 14

Form 3048    1/01

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 months payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification  and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                     Form 3048    1/01
UIWAMERS.06-11/00 36187.14149                        Page 6 of 14

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                          Form 3048   1/01
UIWAMERS.07-11/00 36187.14149                         Page 7 of 14

Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
UIWAMERS.10-11/00 36187.14149                                Page 10 of 14

Form 3048    1/01

17.  **Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

18.  **Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.  **Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  **Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice  of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleraion given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of

Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23.  Reconveyance.  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24.  Substitute Trustee.  In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25.  Use of Property.  The Property is not used principally for agricultural purposes.

26.  Attorneys' Fees.  Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Secuurity Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limittaion attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____  (Seal)
DOUGLAS CARROLL              Borrower

_____  (Seal)
                             Borrower

_____  (Seal)
                             Borrower

_____

_____  (Seal)
                             Borrower

_____  (Seal)
                             Borrower

_____  (Seal)
                             Borrower

[Space Below This Line For Acknowledgement]

State of Washington _____ County ss: PIER KING

On this 27TH day of SEPTEMBER, 2006 before me the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared

to me Known to be the individual(s) described in and who executed the foregoing instrument, and acknowledged to me the he/she/they signed and sealed the said instrument as his/her/their free and voluntary act and deed, for the uses and purposes therein mentioned.

Witness my hand and official seal affixed the day and year in this certificate above written.

My Commission expires: 9/19/2007

_____
Notary Public in and for the State of Washington residing at

ALEICIA A. MOULTRY
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
SEPTEMBER 19, 2007

REQUEST FOR RECONVEYANCE

TO TRUSTEE:

The undersigned is the holder of the note or notes secured by this Deed of Trust. Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.

Dated: _____     _____

WASHINGTON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
UIWAMERS.14-11/00 36187.14149                     Page 14 of 14

Form 3048   1/01

# EXHIBIT "B"

REDACTED
REDA
CTED          REDACTED

# ADJUSTABLE RATE NOTE
### (MTA Twelve Month Average Index - Payment Caps)

REDACTED

LOAN NO.
MIN: REDACTED

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

SEPTEMBER 26, 2006          BELLEVUE, WASHINGTON
[Date]                                    [City]                                    [State]

17055 16TH AVENUE SW, NORMANDY PARK, WASHINGTON 98166
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 608,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed ONE HUNDRED AND FIFTEEN PERCENT          ( 115.00%) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is PRIMARY RESIDENTIAL MORTGAGE INC., A NEVADA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the 1st day of FEBRUARY, 2007          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 45/100----- percentage point(s) ( 3.450 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). The rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than 9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on DECEMBER 1, 2006 . I will make these payments every month until I have paid all of the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to Interest before Principal. If, on NOVEMBER 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 4750 W. WILEY POST WAY, SALT LAKE CITY, UTAH 84116 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,955.57 unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of DECEMBER, 2007 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED AND FIFTEEN percent ( 115.00 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

Case 4:14-bk-00414-BMW    Doc 248    Filed 12/19/18    Entered 12/19/18 16:33:28    Desc
Main Document        Page 25 of 38

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

PREPAYMENT PENALTY ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Case 4:14-bk-00414-BMW    Doc 248    Filed 12/19/18    Entered 12/19/18 16:33:28    Desc
Main Document      Page 26 of 38

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)         _____ (Seal)
DOUGLAS CARROLL          Borrower                                          Borrower

_____ (Seal)         _____ (Seal)
                         Borrower                                          Borrower

_____ (Seal)         _____ (Seal)
                         Borrower                                          Borrower

LOAN NO. REDACTED

## Prepayment Penalty Addendum to Note

This Prepayment Penalty Addendum to Note ("Addendum") is made this 26th day of SEPTEMBER, 2006 by the undersigned Borrower(s) ("Borrower") in favor of PRIMARY RESIDENTIAL MORTGAGE INC. ("Lender").

Whereas, Borrower simultaneously herewith executed and delivered a promissory note ("Note") to Lender; and

Whereas, Borrower and Lender wish to revise the Note to provide for a prepayment penalty.

In consideration for the granting of the loan evidenced by the Note, Borrower agrees as follows:

1. In addition to the covenants and agreements made in the Note, Borrower further covenants and agrees that the Section in the Note titled "Borrower's Right to Prepay" or "Borrower's Payments Before They Are Due" is amended so that Borrower agrees to pay a prepayment penalty as follows:

I/We have the right to make payments of principal at any time before they are due. The payment of principal only is known as a "prepayment". When I/We make a prepayment, I/We will tell the Note Holder in writing that I/We are doing so. If, within the first 36 months following the date of the Note and the Security Instrument I/We make a full prepayment or partial prepayment(s), I/We will at the same time pay to the Note Holder a prepayment charge. The prepayment charge will be equal to 5% of any amount prepaid on the amount of any prepayment that when added to all other amounts prepaid during the twelve(12) month period preceding the date of any prepayment, exceeds twenty percent (20%) of the original principal amount of the Note. Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party no Prepayment penalty will be assessed. In that event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

2. The Note is not modified except as amended by this Addendum. All terms and conditions of the Note not in conflict with this Addendum shall remain in full force and effect. To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note, the provisions of the Addendum shall prevail over and supersede any such inconsistent provisions of the Note.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Addendum.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
DOUGLAS CARROLL            -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

*[Sign Original Only]*

Original Note Addendum to be returned with closing package.

Prepayment Penalty Option Note Addendum/S Standard/Standard 1st S/Standard CO S/Standard GA 2NOO S/Standard GA OO S/Standard IL 1st S/Standard NC NOO S/Standard NC OO2nd S/Standard NOO 1st S/Standard PA 1st S/Standard SC 002nd S/Standard TX 1st S
HP440474.A02-01/06   36187.14149

# EXHIBIT "C"

Electronically Recorded
REDACTED

INGEO SYSTEMS INC          ADT          15 00
Page 001 of  002
02/22/2012 01:53
King County, WA

When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

This space for Recorder's use

DocID# REDACTED

Tax ID:

Property Address:
17055 16th Ave SW
Normandy Park, WA 98166-3435
WAB-ADT 16950955      2/14/2012

Recording Requested By:
Bank of America
Prepared By:
Diana DeAvila
888-603-9011
450 E. Boundary St.
Chapin, SC 29036

MIN #: REDACTED      MERS Phone #:  888-679-6377

## ASSIGNMENT OF DEED OF TRUST

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. whose address is 1901 E Voorhees Street, Suite C, Danville, IL 61834 does hereby grant, sell, assign, transfer and convey unto BANK OF AMERICA, N.A whose address is 400 NATIONAL WAY, SIMI VALLEY, CA 93065 all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

Original Lender:        PRIMARY RESIDENTIAL MORTGAGE INC.
Made By:                DOUGLAS CARROLL, AS HIS SEPARATE ESTATE
Original Trustee:       TRANSNATION TITLE INSURANCE COMPANY
Date of Deed of Trust:  9/26/2006
Original Loan Amount:   $608,000.00

Recorded in King County, WA on: 10/4/2006, book N/A, page N/A and instrument number 20061004000368

Property Legal Description:
LOT 2 IN BLOCK 3 OF ASSESSORS PLAT OF NORMANDY PARK HIGHLANDS, AS PER PLAT RECORDED IN VOLUME 47 OF PLATS, PAGE 33, RECORDS OF KING COUNTY AUDITOR; EXCEPT THAT PORTION THEREOF DESCRIBED AS FOLLOWS:  BEGINNING AT A POINT ON THE NORTHEASTERLY LINE OF SAID LOT 2, WHICH BEARS NORTH 56 DEGREES 04'40" WEST 59.06 FEET FROM THE MOST EASTERLY CORNER OF SAID LOT 2; THENCE SOUTH 56 DEGREES 04'40" EAST 59.06 FEET TO SAID MOST EASTERLY CORNER; THENCE SOUTH 63 DEGREES 58'06" WEST ALONG THE SOUTHEASTERLY BOUNDARY OF SAID LOT 2, 167. 82 FEET TO THE MOST SOUTHERLY CORNER OF SAID LOT 2; THENCE NORTH 12 DEGREES 14'34" EAST 61.59 FEET, MORE OR LESS, TO A POINT WHICH BEARS SOUTH 62 DEGREES 33'20" WEST 100 FEET FROM THE POINT OF BEGINNING; THENCE NORTH 62 DEGREES 33'20" EAST 100 FEET TO THE TRUE POINT OF BEGINNING; SITUATE IN THE CITY OF NORMANDY PARK, COUNTY OF KING, STATE OF WASHINGTON  SITUATE IN THE CITY OF SEATTLE, COUNTY OF KING, STATE OF WASHINGTON.

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
02/21/12

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By:
Miguel Romero Vice President

REDACTED

State of California
County of Ventura

On 02/21/12 before me, _____ Marcellus Ellis _____, Notary Public, personally
appeared _____ Miguel Romero _____ who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to
me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: _____ Marcellus Ellis _____ (Seal)
My Commission Expires: _____ October 31, 2013

MARCELLUS ELLIS
Commission # 1869981
Notary Public - California
Los Angeles County
My Comm. Expires Oct 31, 2013

DocID# REDACTED

**Electronically Recorded**
**20140514000342**
SIMPLIFILE                    ADT                    15.00
Page 001 of 002
05/14/2014 10:54
King County, WA

When recorded mail to:
Fay Servicing, LLC C/O: Robert (Tres) Mackey
Ref: Trailing Documents - USROF/NB
939 W. North Avenue Suite 680
Chicago, IL 60642

This space for Recorder's use

DocID# REDACTED

Tax ID:

Property Address:
17055 16th Avenue SW
Normandy Park, WA 98166-3435
WA0-ADT  28840702    3/12/2014  FAY0131

Recording Requested By:
**Bank of America**
Prepared By:
**Diana De Avila**
**800-444-4302**
**1800 Tapo Canyon Road**
**Simi Valley, CA 93063**

## ASSIGNMENT OF DEED OF TRUST

For Value Received, BANK OF AMERICA, N.A. whose address is **1800 TAPO CANYON ROAD, SIMI VALLEY, CA 93063** does hereby grant, sell, assign, transfer and convey unto **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR PROF-2013-S3 REMIC TRUST III.** whose address is **60 LIVINGSTON AVENUE, EP-MN-WS3D, ST. PAUL, MN 55107, ATTENTION: STRUCTURED FINANCE SERVICES – PROF** all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

| | |
|---|---|
| Beneficiary: | **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE INC., ITS SUCCESSORS AND ASSIGNS** |
| Made By: | **DOUGLAS CARROLL, AS HIS SEPARATE ESTATE** |
| Original Trustee: | **TRANSNATION TITLE INSURANCE COMPANY** |
| Date of Deed of Trust: | 9/26/2006 |
| Original Loan Amount: | $608,000.00 |

Recorded in **King County, WA** on: 10/4/2006, book N/A, page N/A and instrument number 20061004000368

Property Legal Description:
LOT 2 IN BLOCK 3 OF ASSESSORS PLAT OF NORMANDY PARK HIGHLANDS, AS PER PLAT RECORDED IN VOLUME 47 OF PLATS, PAGE 33, RECORDS OF KING COUNTY AUDITOR; EXCEPT THAT PORTION THEREOF DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE NORTHEASTERLY LINE OF SAID LOT 2, WHICH BEARS NORTH 56 DEGREES 04'40" WEST 59.06 FEET FROM THE MOST EASTERLY CORNER OF SAID LOT 2; THENCE SOUTH 56 DEGREES 04'40" EAST 59.06 FEET TO SAID MOST EASTERLY CORNER; THENCE SOUTH 63 DEGREES 58'06" WEST ALONG THE SOUTHEASTERLY BOUNDARY OF SAID LOT 2, 167. 82 FEET TO THE MOST SOUTHERLY CORNER OF SAID LOT 2; THENCE NORTH 12 DEGREES 14'34" EAST 61.59 FEET, MORE OR LESS, TO A POINT WHICH BEARS SOUTH 62 DEGREES 33'20" WEST 100 FEET FROM THE POINT OF BEGINNING; THENCE NORTH 62 DEGREES 33'20" EAST 100 FEET TO THE TRUE POINT OF BEGINNING; SITUATE IN THE CITY OF NORMANDY PARK, COUNTY OF KING, STATE OF WASHINGTON  SITUATE IN THE CITY OF SEATTLE, COUNTY OF KING, STATE OF WASHINGTON.

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
  MAR 18 2014

                            BANK OF AMERICA, N.A.

                    By: _____
                            Beverly Brooks
                            Assistant Vice President

# ACKNOWLEDGMENT

State of California
County of _____ Ventura _____ )

On _March 18, 2014_____ before me, _S. Greenwald Notary Public_____
                                              (insert name and title of the officer)

personally appeared __BEVERLY BROOKS_____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

S. GREENWALD
COMM. 1893744
NOTARY PUBLIC CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires June 25, 2014

REDACTED

REDACTED

**Electronically Recorded**
**20150909001077**

SIMPLIFILE       ADT       $4.00
Page 001 of 001
09/09/2015 03:28
King County, WA

PREPARED BY AND RETURN TO:
M. E. Wileman
2860 Exchange Blvd. # 100
Southlake, TX 76092

**Assignment of Deed of Trust**       Send Any Notices To Assignee.

For Valuable Consideration, the undersigned, **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR PROF-2013-S3 REMIC TRUST III** **60 Livingston Avenue, EP-MN-WS3D, St. Paul, MN 55107 (Assignor)** by these presents does assign, and set over, without recourse, to **USROF III LEGAL TITLE TRUST 2015-1, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE 60 Livingston Avenue, EP-MN-WS3D, St. Paul, MN 55107 (Assignee)** the described Deed of Trust with all interest, all liens, any rights due or to become due thereon, executed by **DOUGLAS CARROLL, AS HIS SEPARATE ESTATE** to Mortgage Electronic Registration Systems, Inc., (MERS) AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE INC., ITS SUCCESSORS AND ASSIGNS, Trustee: TRANSNATION TITLE INSURANCE COMPANY Said Deed of Trust Dated: 9/26/2006 is recorded in the State of WA, County of King on 10/4/2006, as Instrument No. 20061004000368 AMOUNT: $ 608,000.00    Parcel # 6116500170
Property Address: 17055 16TH AVENUE SW, NORMANDY PARK, WA 98166
IN WITNESS WHEREOF, the undersigned corporation/trust has caused this instrument to be executed by its proper officer.
Executed on: September 9, 2015
U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR PROF-2013-S3 REMIC TRUST III

By: _____

Michael E. Wileman, Authorized Signator

State of Texas, County of Tarrant

      On 09/09/2015, before me, the undersigned, personally appeared Michael E. Wileman, who acknowledged that he/she is Authorized Signator of/for U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR PROF-2013-S3 REMIC TRUST III and that he/she executed the foregoing instrument and that such execution was done as the free act and deed of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR PROF-2013-S3 REMIC TRUST III .

CARROLL REDACTE

C. LAFFERTY
MY COMMISSION EXPIRES
November 30, 2018

_____

Notary public. C. Lafferty
My commission expires: November 30, 2018

NB106700
NBLLC/ USROF II, II/
WA   King

Prepared By and Return To:
Kathleen Collins
Collateral Department
Meridian Asset Services, Inc.
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

Space above for Recorder's use

Loan No:REDACTED
Sver Ln N


REDACTED

## ASSIGNMENT OF DEED OF TRUST

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **PROF-2013-S3 LEGAL TITLE TRUST, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE**, whose address is **60 LIVINGSTON AVENUE, EP-MN-WS3D, ST. PAUL, MN 55107**, (ASSIGNOR), does hereby grant, assign and transfer to **US BANK TRUST N.A., AS TRUSTEE OF THE SCIG SERIES III TRUST**, whose address is **7114 E. STETSON DRIVE, SUITE 250, SCOTTSDALE, ARIZONA 85251**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain deed of trust, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Deed of Trust: 9/26/2006
Original Loan Amount: $608,000.00
Executed by (Borrower(s)): DOUGLAS CARROLL
Original Trustee: TRANSNATION TITLE INSURANCE COMPANY
Original Beneficiary: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS
Filed of Record: In Book N/A, Page N/A,
Document/Instrument No: 20050630003168 in the Recording District of KING, WA, Recorded on 10/4/2006.

Property more commonly described as: **17055 16TH AVE SW, NORMANDY PARK, WASHINGTON 98166**

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: _1/22/2018_

**PROF-2013-S3 LEGAL TITLE TRUST, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE, BY PRP-SC III, LLC, ITS ATTORNEY-IN-FACT**

By: SCOTT GILBERT
Title: MANAGER

Witness Name: _YULIE MITCHELL_

REDACTED

A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of ___Arizona___
County of ___Maricopa___

On ___1-22-18___, before me, ___Karen Gilbert___ a Notary Public, personally appeared SCOTT GILBERT, MANAGER of/for PRP-SC III, LLC, AS ATTORNEY-IN-FACT FOR PROF-2013-S3 LEGAL TITLE TRUST, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of ___AZ___ that the foregoing paragraph is true and correct. I further certify SCOTT GILBERT, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): ___Karen Gilbert___
My commission expires: ___11-17-18___

KAREN GILBERT
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires Nov. 17, 2018

REDACTED

Michelle R. Ghidotti-Gonsalves, Esq. (SBN 27180)
LAW OFFICES OF MICHELLE GHIDOTTI
1920 Old Tustin Ave.
Santa Ana, CA 92705
Ph: (949) 427-2010
Fax: (949) 427-2732
kzilberstein@ghidottilaw.com

Attorney for Creditor
US Bank Trust N.A. as Trustee of the SCIG Series III Trust

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA – TUCSON DIVISION

| | |
|---|---|
| In Re: ) | CASE NO.: 4:14-bk-00414-BMW |
| ) | |
| Douglas Allan Carroll, ) | CHAPTER 11 |
| ) | |
| Debtors. ) | **CERTIFICATE OF SERVICE** |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I am employed in the County of Orange, State of California. I am over the age of eighteen and not a party to the within action. My business address is: 1920 Old Tustin Avenue, Santa Ana, CA 92705.

I am readily familiar with the business's practice for collection and processing of correspondence for mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit in the ordinary course of business.

On December 19, 2018 I served the following documents described as:

1

- **MOTION TO REOPEN CASE**

on the interested parties in this action by placing a true and correct copy thereof in a sealed

envelope addressed as follows:

(Via United States Mail)

| **Debtor** | **U.S. Trustee** |
|---|---|
| DOUGLAS ALLAN CARROLL | OFFICE OF THE U.S. TRUSTEE |
| 7850 N SILVERBELL ROAD #114 | 230 NORTH FIRST AVENUE |
| TUCSON, AZ 85743 | SUITE 204 |
| | PHOENIX, AZ 85003 |
| **Debtor's Counsel** | |
| CHARLES R HYDE | **US Trustee Counsel** |
| LAW OFFICES OF C.R. HYDE | RENEE SANDLER SHAMBLIN |
| 2810 N SWAN RD. #160 | OFFICE OF THE U.S. TRUSTEE |
| TUCSON, AZ 85712 | 230 North First Avenue, Suite 204 |
| | PHOENIX, AZ 85003-1706 |

 _xx___(By First Class Mail) At my business address, I placed such envelope for deposit with the United States Postal Service by placing them for collection and mailing on that date following ordinary business practices.

_____Via Electronic Mail pursuant to the requirements of the Local Bankruptcy Rules of the Eastern District of California

 __xx_ (Federal) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

     Executed on December 19, 2018 at Santa Ana, California

*/s / Krystle Miller*
Krystle Miller

2